**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

| | | |
|---|---|---|
| **THOMAS G. HENSLEY and PAMELA L. HENSLEY as natural parents and wrongful death beneficiaries of Coty Lee Hensley, deceased, and THE ESTATE OF COTY LEE HENSLEY, Deceased, by PAMELA L. HENSLEY, Administratrix,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 2:13-cv-02436** |
| **v.** | ) ) | |
| **METHODIST HEALTHCARE MEMPHIS HOSPITALS, MARK C. BUGNITZ, M.D., and JAMES W. EUBANKS, III, M.D.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

_____

## ORDER ON PENDING MOTIONS

_____

Before the Court are seven pending motions. On December 28, 2015, the remaining Defendants filed four Motions to Exclude the Causation Opinions of the Plaintiffs' various experts. (ECF Nos. 211–214). The Defendants also filed an accompanying Motion for Summary Judgment, arguing that if the Plaintiffs' experts were excluded, the Plaintiffs would be unable to establish essential elements of their healthcare-liability action under Tennessee law. (ECF No. 215). The Plaintiffs responded in opposition to the Motions to Exclude on January 26, 2015. (ECF Nos. 234–237). After the Court granted leave, the Defendants filed replies on February 13, 2015. (ECF Nos. 248–251).

The Plaintiffs' one pending motion is a Motion to Strike and Limit the Number of Defendants' Expert Witnesses, filed December 29, 2015. (ECF No. 216). The Defendants filed

1

separate responses to this motion. (ECF Nos. 222, 225, 227). Without seeking leave of the Court to file, the Plaintiffs filed a reply on January 16, 2015. (ECF No. 228). The Defendants subsequently filed a Motion to Strike the Plaintiffs' reply to this motion, arguing that the Plaintiffs violated Local Rule 7.2(c) in submitting a reply without the Court's leave. (ECF No. 231). The Plaintiffs never responded to this Motion to Strike, which correctly set forth the requirement for seeking leave. Thus, as an initial matter, the Defendants' Motion to Strike the Plaintiffs' Reply is **GRANTED**. The Court addresses each of the pending motions below, in the order deemed most appropriate.

## BACKGROUND

On June 28, 2012, Plaintiff Thomas Hensley found his son, 11-year-old Coty Lee Hensley semi-conscious, lying on a porch of a job-site with blood coming from a small puncture-wound on the right side of his neck. (Compl. ¶ 35–37, ECF No. 1). Thomas rushed Coty to Baptist Memorial Hospital – North Mississippi. (*Id.* ¶ 38, 40). Upon arrival, Coty was in significant respiratory distress. He was intubated and transferred by helicopter to Methodist LeBonheur Children's Hospital in Memphis, Tennessee, for more specialized care. Coty arrived at LeBonheur around 10:00 p.m. the same day. (*Id.* ¶ 43–45; Defs.' Statement of Undisputed Facts ¶ 7–8, ECF No. 215-2). At LeBonheur, a CT scan found no significant injury to vessels in the neck, and the puncture wound was deemed insignificant. (Defs.' Facts ¶ 8). Coty was transferred to the intensive care unit, but his pulmonary function continued to deteriorate. (*Id.* ¶ 9). Doctors made the decision to place the patient on a heart-lung bypass, or extracorporeal membrane oxygenation ("ECMO"), by cannulating the femoral vessels. (*Id.* ¶ 10–11). This involved placing a catheter into the abdominal aorta through the femoral vessel in the right upper thigh. (*Id.* ¶ 12). The cannulation was unsuccessful, and Coty died. (*Id.* ¶ 15). The causation of

Coty's death is central to this case: the Plaintiffs allege that Defendants Dr. Mark Bugnitz and Dr. James Eubanks were negligent in treating the patient at LeBonheur and that their negligence caused his death.

No autopsy was performed the day of Coty's death. (*Id.* ¶ 17). He was embalmed and buried, and more than two weeks later, his parents had the body disinterred and flown to Dallas, Texas, for a private autopsy by Dr. Amy Gruszecki. (*Id.* ¶¶ 18–19). Dr. Gruszecki is an expert proffered by the Plaintiffs and one of the experts challenged by the Defendants. Her opinions, as well as the opinions of the Plaintiffs' experts, are discussed in detail below.

## ADMISSIBILITY OF EXPERTS

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts, and trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony."[1] Under Rule 702, a witness may give expert testimony if he is qualified by "knowledge, skill, experience, training or education," if the testimony is relevant, and if the testimony is reliable.[2] Each of the Defendants' Motions to Exclude challenges the reliability of the Plaintiffs' experts' testimony. A reliability inquiry is "flexible,"[3] but it should assess "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'"[4] The Supreme Court provided several factors to

---

[1] Fed. R. Evid. 702 advisory committee's notes, 2000 amend.; *see Daubert v. Merrell Dow Pharm., Inc.*, 508 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 136 (1999).

[2] Fed. R. Evid. 702; *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

[3] *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting *Kumho*, 526 U.S. at 150).

[4] *Id.* at 529 (quoting Fed. R. Evid. 702).

determine reliability: "testing, peer review, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community."[5] Finally, although the proponent of expert testimony need not prove that the opinion is correct, the proponent does bear the burden of proving the opinion's admissibility.[6]

## DISCUSSION

### I. Dr. Amy Gruszecki

The Defendants move to exclude the causation opinions of Dr. Amy Gruszecki, MSFS, D.O., first, as unreliable under Federal Rule of Evidence 702. (ECF No. 211). Second, the Defendants seek to exclude the opinions of Dr. Gruszecki as a sanction for spoliation of evidence. (ECF No. 212).

#### A. Reliability

The Defendants argue that Dr. Gruszecki's cause-of-death opinions are not based on accepted scientific methods and are therefore inherently unreliable. Dr. Gruszecki performed an autopsy on July 19, 2012, over two weeks after Coty's death. Dr. Gruszecki's two opinions relevant to this Order are the following: (1) her estimation of "[a]pproximately 1 to 1.5 liters of blood in the lower abdomen and pelvis retroperitoneal and peritoneal tissues;" and (2) her conclusion that Coty "died as the result of extensive retroperitoneal and peritoneal hemorrhage due to probable blunt force trauma to the abdomen."[7] The first finding led to Dr. Gruszecki's conclusion regarding the cause of death. Her opinions, if reliable, are relevant to the Plaintiffs'

---

[5] *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert,* 508 U.S. at 593–94).

[6] *EEOC v. Kaplan Higher Educ.*, 748 F.3d 749, 752 (6th Cir. 2014) (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001)).

[7] Final Autopsy Report of Dr. Amy Gruszecki 1, ECF No. 211-4.

case: they seek to establish that Coty died as a result of blunt-force trauma, which led to bleeding in the retroperitoneal and peritoneal spaces, and subsequently, the child's death. The Plaintiffs allege that Dr. Bugnitz and Dr. Eubanks were negligent in failing to correctly diagnose and properly treat Coty under the relevant professional standard of care. Their negligence, Plaintiffs allege, was the proximate cause of Coty's death.

First, the Defendants challenge Dr. Gruszecki's estimation of the amount of blood in the retroperitoneal and peritoneal spaces as unreliable and not based on acceptable scientific practices. At Dr. Gruszecki's deposition, defense counsel questioned her as to her method of measuring the amount of blood in the tissues. She responded that the estimation was

> just based on experience. . . . [T]he amount of blood infiltrating throughout the tissue is unable to be measured with a measuring cup because you cannot scoop up the fat and scoop it out in order to measure how much blood is in there. So it's an estimate based on what . . . is there and the volume based on my experience that I think it is. Which is why I don't give an exact amount. I said 1 to 1-1/2 liters.[8]

The Defendants point out that Dr. Gruszecki used the word "guesstimate" when describing her methodology. But when asked to clarify, she stated that her "speculation" was "based on [her] experience of blood in cavities."[9] The Defendants proffer no expert to demonstrate that pathologists do not routinely estimate levels of blood in conducting autopsies. Instead, they cite their own expert's opinion that "[i]t is not medically or scientifically possible after death to accurately, or even semi accurately, . . . determine the exact volume of blood that has infused

---

[8] Dep. of Dr. Amy Gruszecki 32:14–21, ECF No. 211-5.

[9] *Id.* at 33:1–7.

within soft tissues and musculature, such as the retroperitoneal space, from an antemortem hemorrhage."[10]

Aside from Dr. Gruszecki's visual estimation of the amount of blood in the tissues, the Defendants also challenge her estimation because she could not tell what percentage of the blood was diluted with embalming fluid. Dr. Gruszecki did not test the blood to determine the amount of dilution, and therefore, the exact amount of blood in the tissues.[11] The parties dispute whether it was even possible to determine the percentage of blood versus the percentage of embalming fluid.

While Dr. Gruszecki's estimation of the amount of blood appears to be fertile grounds for cross-examination, it is not unreliable under Rule 702, *Daubert*, and its progeny. Dr. Gruszecki has performed thousands of autopsies. Based on her experience, she testified that "[t]he blood that [she] found was . . . it was infiltrating through the retroperitoneal tissues and around the pancreas, kidney, bladder, adrenal and intestines. There was also some free peritoneal blood present within the pelvic gutter and around the bladder."[12] In this Motion, the Defendants have not disputed the presence of a large amount of blood in the spaces, nor have they disputed that an *exact* measurement of the amount of blood is impossible. Although one defense expert opined that a pathologist could not accurately estimate the exact amount of blood, Dr. Gruszecki's experience in conducting autopsies should allow her to opine broadly on the amount of blood that she saw, even if it is impossible to determine the precise volume. The Defendants are free to challenge Dr. Gruszecki's estimation and her failure to determine a percentage of dilution, if

---

[10] Rule 26 Report of Kris Sperry, M.D., ECF No. 211-6.

[11] The Court addresses the Defendants' spoliation-of-evidence argument in full below.

[12] Dep. of Dr. Amy Gruszecki 32:4–9.

ascertainable, in front of the jury. Her visual estimation—when an exact measurement was admittedly not possible and not regular practice—is sufficiently reliable under Rule 702 to admit her testimony.

Second, the Defendants challenge Dr. Gruszecki's finding that, in light of the amount of blood in the peritoneal and retroperitoneal tissues, Coty died as a result of that bleeding. The Defendants argue because Dr. Gruszecki "could not, and did not, identify the source of the alleged bleeding," her causation opinion is not reliable.[13] Dr. Gruszecki based her opinion on the amount of blood in the tissues—an amount she believes is consistent with bleeding that started well before the doctors performed ECMO:

> My opinion is that the—the insertion of an ECMO catheter or any catheter within an hour of his death would not have caused this bleeding that I found at autopsy.
> . . . .
> [T]he bleeding was much too extensive and infiltrative throughout the retroperitoneal space that I saw to have been caused within the short period of time of roughly an hour.[14]

When asked how fast a hematoma would form, Dr. Gruszecki testified that she could not give an exact rate of bleeding. She elaborated:

> As far as the length of time it would take [to form the hematoma], just simply based on the anatomy of the retroperitoneal space that there is so much fat in that fat pad, in order for blood to diffuse through the whole thing to the extent that it had in Coty, it's going to simply take time.[15]

---

[13] Defs.' Mem. in Supp. Mot. to Exclude Ops. of Dr. Amy Gruszecki Under 702, at 15, ECF No. 211-1.

[14] Dep. of Dr. Amy Gruszecki 17:20–18:3. Although unclear from the motions before the Court, it appears that the Defendants may assert that ECMO caused the extensive bleeding, rather than blunt-force trauma. The Plaintiffs have not proffered Dr. Gruszecki to opine on the use of ECMO.

[15] Dep. of Dr. Amy Gruszecki 39:17-22.

Dr. Gruszecki did not find any evidence of bruising or trauma to the abdomen, and therefore the Defendants argue that she may not offer her opinion as to the source of the bleeding and the cause of death.

Dr. Gruszecki's opinion is a proper differential diagnosis. Differential diagnosis is "[t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history."[16] The Sixth Circuit outlined its test for proper differential diagnosis: the doctor must "(1) objectively ascertain[], to the extent possible, the nature of the patient's injury . . . , (2) 'rule[] in' one or more causes of injury using a valid methodology, and (3) engage[] in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion to which cause is most likely."[17]

Dr. Gruszecki stated in her report and consistently testified at her deposition that she considered all relevant, potential causes of death in light of the circumstances surrounding the injury. Amidst other testimony supporting her opinion, Dr. Gruszecki testified as follows:

> After I ruled out that he did not have a heart disease and he did not have any lung disease, that his lungs were perfectly normal for a child and there is nothing wrong with them, then I came down to, after I ruled everything else out, that the cause of his death was, in fact, this bleeding.[18]

---

[16] *Hardyman v. Norfolk & W. Ry. Co.*, 253 F.3d 255, 260 (6th Cir. 2001) (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 214 (1994)).

[17] *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 760 (3d Cir. 1994)).

[18] Dep. of Dr. Amy Gruszecki 66:20–25.

Although the Plaintiff bears the burden of proving admissibility, the Defendants have offered no rebuttal to the differential-diagnosis argument in their Reply. Dr. Gruszecki identified the bleeding, ruled in several causes—heart disease, ECMO, and others—and ruled out other potential causes of the bleeding based upon her experience and findings from the autopsy. The Defendants have not challenged her experience or the method by which she conducted the autopsy, other than the way she estimated the amount—not the presence—of a substantial amount of blood. Again, the Defendants will have ample opportunity to devalue the weight of Dr. Gruszecki's testimony in front of a jury. Under Rule 702, however, Dr. Gruszecki's opinions are sufficiently reliable for the jury's consideration. The Defendants' Motion to Exclude Dr. Gruszecki under Rule 702 is **DENIED**.

### B. Spoliation

In performing the autopsy, Dr. Gruszecki collected three tubes of free blood in the pelvis and one tube of blood from the femoral artery.[19] She submitted two of the blood samples to NMS Labs for toxicology testing and retained two samples. Dr. Gruszecki's agreement with NMS requires NMS to retain samples for one year, after which they are discarded. Dr. Gruszecki did not give any special instructions to NMS, and the parties agree that NMS discarded the samples in accordance with the agreement on September 23, 2013. Dr. Gruszecki also discarded the specimens she retained after one year, according to appropriate standards of practice. Moreover, the Shelby County Medical Examiner's Office ("SCME") retained two samples before embalming. Plaintiffs' counsel sent the SCME a "Demand for Preservation of Evidence" letter on July 27, 2012, less than a month after the samples were obtained but before the Plaintiffs filed this lawsuit. The SCME apparently sent these samples to NMS Labs for

---

[19] Final Autopsy Report of Dr. Amy Gruszecki 3.

testing at either the Plaintiffs' or Dr. Gruszecki's request, but NMS Labs discarded the samples on November 25, 2013.[20]

As discussed above, the Defendants question Dr. Gruszecki's opinion as to the amount of blood in the retroperitoneal and peritoneal spaces. They believe, and an expert has opined, that the blood was substantially diluted by embalming fluid. Dr. Gruszecki has not argued that the blood was not diluted, but rather that her experience in performing autopsies led to her conclusion without a finding blood-to-embalming-fluid ratio. The Defendants now seek outright exclusion of all of Dr. Gruszecki's opinions as a sanction for spoliation of the blood samples, which have been discarded. The Defendants argue that they are now unable to determine the percentage of embalming fluid to rebut Dr. Gruszecki's estimation of the amount of blood.

The Sixth Circuit looked to the Second Circuit for guidance on the issue of spoliation and adopted a three-part test:

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.[21]

A spoliation sanction requires an inquiry into the specific facts of each case, and a court may impose sanctions ranging from a jury instruction to dismissal of the case.[22] Sanctions "should

---

[20] From the parties' numerous briefs, the number of samples and which samples contained pre- and post-embalming blood is unclear. These facts, however, are not dispositive for purposes of ruling on the Motion to Exclude for Spoliation.

[21] *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (internal quotation marks omitted) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

[22] *See id.* at 554.

serve both fairness and punitive functions," and their severity should bear relation to the specific facts of each case.[23]

### 1. Control and a Duty to Preserve

A duty to preserve evidence "may arise 'when a party should have known that the evidence may be relevant to future litigation.'"[24] The Plaintiffs must have had "control over the evidence" and "must have had an obligation to preserve it at the time it was destroyed."[25] Samples originally retained by the Shelby County Medical Examiner ("SCME") were discarded on November 27, 2013, even after Plaintiffs' counsel sent SCME a letter requesting them to preserve such samples on July 27, 2012, less than a month after the samples were obtained.[26] After conducting toxicology tests, NMS Labs, in accordance with its agreement with Dr. Gruszecki, discarded other samples on September 25, 2013. It is undisputed that the Plaintiffs themselves did not have actual possession of the samples at any relevant time. But they did exert control over the samples through their expert Dr. Gruszecki, who knew of the pending litigation before she destroyed the samples she retained and before NMS discarded the samples sent by Dr. Gruszecki. Furthermore, counsel's letter to the SCME shows that Plaintiffs knew that they exercised exclusive control over the samples and knew that they might become relevant to future litigation. Plaintiff, Plaintiffs' counsel, and Plaintiffs' expert exerted control and had a duty to preserve the samples.

---

[23] *Id.*

[24] *Id.* (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

[25] *Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 380, 383–84 (6th Cir. 2013) (citing *Beaven*, 622 F.3d at 553)).

[26] It is unclear from the parties' briefs or the attached affidavits whether the SCME or NMS Labs destroyed these original specimens. This fact, however, is not determinative of the Court's ruling.

## 2. Culpable State of Mind

Next, the Defendants must show that the Plaintiffs "destroyed the evidence knowingly or negligently."[27] This measure of intent "depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction."[28] The Defendants do not argue that the Plaintiffs maliciously destroyed the specimens to prevent the Defendants from testing them. Instead, they argue that the Plaintiffs knew that the evidence was relevant to the case, knew that routine destruction by NMS Labs was likely, and yet failed to take any steps to preserve the evidence. Furthermore, Plaintiffs' counsel had already sent a letter to another entity—the SCME—requesting the preservation of specimens. Although the Plaintiffs may not have known of potential claims and defenses at the time of autopsy, they were sufficiently on notice of litigation during the time in which NMS held the specimens to create an obligation to preserve the samples.

In light of Plaintiffs' counsel's letter to the SCME, the Court holds that the Plaintiffs were at least negligent in failing to preserve the evidence. From the facts before the Court, it is clear that Plaintiffs' counsel made a misstep in failing to direct NMS or their expert Dr. Gruszecki to preserve the samples. But this misstep was not reasonable, nor was it harmless. From the inception of this case, the parties have disputed the cause of the child's death, which the Plaintiffs claim was abdominal bleeding. It forms the bases for both the Plaintiffs' allegations of malpractice and the Defendants' defense. Plaintiffs—and their counsel—should have known that any samples taken at their request during an autopsy would be highly relevant

---

[27] *Byrd*, 518 F. App'x at 384.

[28] *Beaven*, 622 F.3d at 553.

to the disposition of the case.  Therefore, while not malicious, the Plaintiffs' failure to preserve relevant evidence was negligent.

### 3.  Relevance

The Defendants argue that the samples of blood taken during the autopsy are crucial to their defense.  In order to rebut Dr. Gruszecki's estimation of a large amount of blood in the retroperitoneal space, the Defendants wish to show that much of the fluid was actually embalming fluid.  Without the blood samples available to test, they cannot ascertain the percentage of dilution.  Furthermore, Dr. Gruszecki's opinion as to causation depends upon her finding of a significant amount of blood in the retroperitoneal and peritoneal spaces.  Thus, if the blood was diluted by embalming fluid, the Defendants could potentially attack Dr. Gruszecki's opinion.  The Plaintiffs' only rebuttal is Dr. Gruszecki's testimony that a blood-to-embalming-fluid ratio is not ascertainable.  Two defense experts have testified otherwise.  The Court will not assess the credibility of these experts from conflicting testimony.  Instead, the Court will hear testimony outside the presence of the jury to determine whether a test, such as a hematocrit, could have determined the percentage of blood and the percentage of embalming fluid.

### 4.  Sanction

If a test exists, the Court will impose a sanction based on its interpretation of the relevant facts.  The Defendants request outright exclusion of Dr. Gruszecki's testimony.  Exclusion is not appropriate:  the severity of a sanction "should correspond to the district court's finding after a 'fact-intensive inquiry into the party's degree of fault' under the circumstances, including the

recognition that a party's degree of fault may 'range from innocence through the degrees of negligence to intentionality.'"[29]

While the Plaintiffs were negligent in failing to preserve the samples, their acts were not intentional or in bad faith. They ordered the autopsy, and their expert sent the samples to the lab. Their expert did not take action to preserve the evidence and destroyed samples that she retained. The lab also discarded the samples in accordance with an agreement with the expert. That Dr. Gruszecki and NMS followed their normal procedures in preserving the samples for one year only shows that the Plaintiffs have not acted in bad faith. Nevertheless, the Defendants lost an opportunity to examine the evidence because of the Plaintiffs' failure to safeguard the samples. Thus, if the test is possible, the Court will issue an appropriate jury instruction to highlight the Plaintiffs' failure to preserve the evidence. Any instruction will be tempered by the Court's finding of a slight degree of fault. The Court will determine the specific sanction before trial or at trial, out of the presence of the jury.

### III. Dr. Dennis Vane

The Defendants seek to exclude the opinions of Dr. Dennis Vane, a pediatric critical care expert, because his opinions rely on Dr. Gruszecki's autopsy report, which the Defendants' claim is unreliable. (ECF No. 214). The Defendants challenge Dr. Vane's opinion, based in part on Dr. Gruszecki's report, that pediatric trauma surgeon Dr. Eubanks should have ordered an abdominal CT scan and performed a focused assessment with sonography for trauma ("F.A.S.T."). Furthermore, Dr. Vane opined that if these tests had been performed, the abdominal bleed would have been detected in sufficient time for lifesaving surgical

---

[29] *Id.* at 554 (alteration omitted) (quoting *Adkins v. Wolever*, 554 F.3d 650, 652–53 (6th Cir. 2009)).

intervention.[30]   The Defendants argue that Dr. Vane, in his deposition, could not testify that additional action by Dr. Eubanks would have made a difference.  "Unless a plan of care was at least possible that would have yielded a better result for this patient," the Defendants argue, "Plaintiffs cannot prove causation."[31]

As discussed above, Dr. Gruszecki's opinions are admissible, and therefore any challenge based on the reliability of Dr. Gruszecki's report is denied.  Furthermore, the Defendants' challenge based on Dr. Vane's failure to opine on a specific surgery that would have yielded a better result is unavailing.  As to causation, the Plaintiffs must prove that "as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not have otherwise occurred."[32]   Dr. Vane opined that "had proper examination and imaging been performed by the pediatric trauma surgeon and others, [the abdominal bleed] would have been detected in a sufficient time and that surgical intervention would have, more likely than not, resulted in his survival without any significant disability."[33]   Dr. Vane did not identify a specific procedure that, more likely than not, would have saved Coty's life.  He did, however, give a number of procedures that would have been appropriate, depending upon what a hypothetical abdominal CT scan or F.A.S.T. showed:

> [I]f this was a retroperineal [sic] bleed with an extending hematoma and I opened it and I didn't find any surgical bleeding, I would have packed it, you know.  If it was surgical bleeding and

---

[30] Rule 26 Report of Dennis Vane, M.D. 16–18, ECF No. 214-3.

[31] Defs.' Mem. in Supp. Mot. to Exclude Causation Ops. of Drs. Vane and Johnston 4, ECF No. 214-1.

[32] Tenn. Code Ann. § 29-26-115(a)(3).

[33] Rule 26 Report of Dennis Vane, M.D. 17–18.

> there was something I could see a vessel that was bleeding specifically, I would have tied it off.[34]

Dr. Vane believed that a defense-counsel question regarding a specific surgical procedure was "unanswerable" because the appropriate procedure depended on what he would have found had the Defendants performed proper examination and imaging. In other words, Dr. Vane has testified that had the Defendants performed in accordance with the standard of care, then Coty's condition, more likely than not, could have been remedied by one or more medical procedures. Dr. Vane's opinion, then, is not mere speculation; it is a reliable, admissible opinion. To the extent the Defendants wish to question the weight of Dr. Vane's opinion and his reliance on Dr. Gruszecki's report, those determinations are left to the jury.

The Defendants also argue that Dr. Vane's opinions are based on his factual errors in interpreting Dr. Gruszecki's report. Dr. Vane purportedly relied upon Dr. Gruszecki's finding of a lack of evidence of a major injury to certain vessels in the relevant spaces. The Defendants argue that "Dr. Gruszecki's report on this topic [vessel injury] is misleading, and Dr. Vane therefore interpreted the report incorrectly. His misinterpretation of the report was then relied upon to exclude an injury to the abdominal aorta from ECMO cannulation."[35] The Defendants state that Dr. Gruszecki's report did not find an absence of injury to the major vessels, "but neither did she clearly indicate her findings." The Defendants' argument is flawed. Dr. Vane testified that his findings were based in part on "the lack of *major* injury to a vessel,"[36] and the Defendants have not explained how Dr. Gruszecki's later "clarification" would make Dr. Vane's original opinion unreliable or incorrect. Nor have the Defendants argued that Dr. Gruszecki's

---

[34] Dep. of Dennis Vane, M.D. 79:8–14, ECF No. 214-4.

[35] Defs.' Mem. in Supp. Mot. to Exclude Causation Ops. of Drs. Vane and Johnston 5.

[36] Dep. of Dennis Vane, M.D. 17:19 (emphasis added).

clarification required a different conclusion based on medical principles. Dr. Vane testified that the presence or absence of a vessel injury "isn't absolutely conclusive" as to etiology.[37] Again, the Defendants may question Dr. Vane about his opinions and whether Dr. Gruszecki's later testimony at deposition would alter Dr. Vane's opinions. Such questions are appropriate for cross examination because Dr. Vane's opinions are reliable under Rule 702. The Motion to Exclude Dr. Vane's testimony is **DENIED**.

### IV. Dr. Santa Johnston

The Defendants seek to exclude the opinions of Dr. Santa Johnston, a pediatric trauma surgery expert, because she relied on Dr. Gruszecki's autopsy findings, which the Defendants argue is unreliable. (ECF No. 214). For the reasons set forth above, Dr. Gruszecki's opinion is admissible; therefore, exclusion for reliance on Dr. Gruszecki's opinions is denied. The Defendants also argue that Dr. Johnston expressed "a totally unsupported ultimate opinion that had an abdominal CT scan been ordered by the trauma surgeon, the patient would have survived."[38] The Defendants' argue that because Dr. Johnston is not a surgeon, she is not qualified to draw this conclusion. Dr. Johnston testified that she is an academic physician in a children's hospital whose duties are to run the intensive care unit, teach residents, and teach nursing students at King's Daughters Children's Hospital in Norfolk, Virginia. She estimates conservatively that she treats over one thousand patients per year for pediatric trauma issues and illnesses.

Whether Dr. Johnston is qualified to give this specific opinion will be determined at trial, as the Defendants' motion does not detail what makes Dr. Johnston unqualified. The Defendants

---

[37] *Id.* at 22:10–20.

[38] Defs.' Mem. in Supp. Mot. to Exclude Causation Ops. of Drs. Vane and Johnston 12.

also offer the conclusory statement that Dr. Johnston's opinion is "mere speculation." The Defendants have not shown why the opinion is speculative or unreliable, but instead rely on their previous argument that Dr. Gruszecki's report is unreliable. Thus, at this stage, the Motion to Exclude Dr. Johnston's opinions is **DENIED**.

## V. Dr. Uwe Otto Peter Josef Schoepf

Dr. Schoepf is a radiologist practicing in South Carolina. The Defendants challenge the admissibility of Dr. Schoepf's radiology opinions for two reasons: (1) Dr. Schoepf does not meet the geographic requirements of Tennessee Code Annotated section 29-26-115(b); and (2) Dr. Schoepf did not draft his Rule 26 expert report. (ECF No. 213).

Tennessee Code section 29-26-115(a) requires a plaintiff in a healthcare-liability action to prove the following:

> (1) The recognized standard of acceptable professional practice in the profession and specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.[39]

A plaintiff must normally proffer expert testimony to prove these elements, and those experts must meet the geographic requirements listed in subsection (b) of the same statute:

> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the

---

[39] Tenn. Code Ann. § 29-26-115(a)(3).

> case and had practiced this profession or specialty in one (1) of
> these states during the year preceding the date that the alleged
> injury or wrongful action occurred. This rule shall apply to expert
> witnesses testifying for the defendant as rebuttal witnesses. The
> court may waive this subsection (b) when it determines that the
> appropriate witnesses otherwise would not be available.[40]

Thus, the Tennessee Supreme Court held that the only grounds for disqualifying a medical expert as incompetent to testify are (1) that the witness is not licensed in Tennessee or a contiguous state; (2) that the witness was not licensed in a particular profession or specialty making his testimony relevant; or (3) that the witness did not practice in Tennessee or a contiguous state during the year preceding the date of the injury or wrongful act.[41]

The Plaintiffs do not dispute that Dr. Schoepf was not licensed to practice medicine in Tennessee or a contiguous state and was not practicing medicine in Tennessee or a contiguous state during the year preceding the decedent's death. Instead, the Plaintiffs argue that Dr. Schoepf will not testify "to establish the facts required to be established by subsection (a)."[42]

The Plaintiffs have not made clear how Dr. Schoepf's testimony—as a rebuttal witness or otherwise—is relevant to this case if it does not seek to establish an element of the cause of action under subsection (a). Dr. Schoepf's proffered testimony relates to the interpretation of medical imaging, and it seeks to prove that the Defendants breached a standard of care and/or that the Defendants' negligence was the proximate cause of the deceased's death. In his Rule 26 Report, Dr. Schoepf disagrees with the findings of the Defendants' experts and concludes,

---

[40] *Id.* § 29-26-115(b). The Sixth Circuit has determined that section 29-26-115(b)'s requirements relate to competence, rather than qualification. Thus, a federal court applies state laws addressing competence via Federal Rule of Evidence 601. *See Bock v. Univ. of Tenn. Med. Ctr.*, 471 F. App'x 459, 461–462 (6th Cir. 2012); *Legg v. Chopra*, 286 F.3d 286, 291 (6th Cir. 2002).

[41] *Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011).

[42] *See* Tenn. Code Ann. § 29-26-115(b).

It is my opinion that based on the records and films, that Coty Hensley had an initial pulmonary contusion due to trauma, complicated by [Acute Respiratory Distress Syndrome] as a result of ensuing hypovolemic shock. It is further my opinion that imaging of the abdomen *would have identified the retroperitoneal bleeding found on autopsy had it been performed*. The clinical picture does not support a suggestion that this patient was suffering from an arrhythmia or some other heart disease or toxic exposure.[43]

Dr. Schoepf's testimony goes to both negligence and causation under subsections (2) and (3) of Tennessee Code Annotated section 29-26-115(a). His opinion supports the theory that the Defendants failed to identify retroperitoneal bleeding allegedly present upon Coty's arrival at LeBonheur because they failed to order further imaging. Furthermore, but for these negligent acts, the Defendants would have identified retroperitoneal bleeding—the cause of death asserted by the Plaintiffs. These opinions would "establish the facts required to be established by subsection (a)."[44]

The Plaintiffs' assertion that Dr. Schoepf will not offer testimony establishing the elements, but rather "medical opinions, such as radiography interpretations," is unavailing. They have not explained how Dr. Schoepf's testimony could be relevant if it does not ultimately seek to prove an element of the cause of action. Dr. Schoepf's testimony that a CT film of the chest indicated bleeding is only relevant to infer that the Defendants should have ordered imaging of the abdomen and that such imaging would have ultimately prevented the child's death. This is textbook breach-of-duty and causation testimony. The Plaintiffs may not shirk compliance with the statute by misclassifying the opinions of a medical expert. Finally, the Plaintiffs have not sought exemption from the contiguity requirement, nor have they argued that Dr. Schoepf's

---

[43] Rule 26 Report of Dr. Schoepf 4, ECF No. 213-3 (emphasis added).

[44] Tenn. Code Ann. § 29-26-115(b).

expert medical opinions stem from a national, rather than local, standard of care.[45] The Defendants' Motion to Exclude the testimony of Dr. Schoepf is **GRANTED**.[46]

## VI. Motion for Summary Judgment

Last, the Defendants seek summary judgment. (ECF No. 215). Filed alongside their motions to exclude, the Defendants' Motion for Summary Judgment only argues that it is "anticipated that Plaintiffs will be unable to establish the essential elements of their claims at trial because this Court should grant the Defendants' joint motions to exclude Plaintiffs' experts."[47] In this Order, the Court has only excluded Dr. Schoepf. The Defendants have not stated, nor can the Court infer, that the exclusion of Dr. Schoepf would result in a total failure to prove one of the elements of Tennessee Code Annotated section 29-26-115(a), which must be proven by expert testimony.[48] Therefore, the Defendants have not shown an absence of genuine dispute as to material facts, and their Motion for Summary Judgment is **DENIED**.

## VI. Plaintiffs' Motion to Limit the Number of Defendants' Expert Witnesses

The Plaintiffs' only pending motion seeks to limit the number of Defendants' expert witnesses. (ECF No. 217). The Plaintiffs state that Dr. Eubanks, in addition to identifying himself and nine other independent experts, has cross-identified ten additional experts. Dr. Bugnitz, in addition to identifying himself and ten independent experts, has cross-identified nine experts. Methodist has identified three independent experts and four treating nurses as experts,

---

[45] *See Shipley*, 350 S.W.3d at 553.

[46] The Plaintiffs also argued that Dr. Schoepf should be excluded because he did not write his own expert report. The Court need not reach this argument because Dr. Schoepf is not competent to testify under Tennessee Code Annotated § 29-26-115(b).

[47] Defs.' Mem. in Supp. Mot. Summ. J. 4, ECF No. 215-1.

[48] *See Payne ex rel. Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990).

and it has cross-identified nine experts. The Plaintiffs argue that "Defendants have no intention of calling all of these experts at trial, but by having numerous fellow physicians identified as expert witnesses, the Defendants essentially make it impossible for the Plaintiffs to depose the Defense experts due to time . . . and due to expense."[49] Furthermore, the Plaintiffs state that designation of so many experts is designed "to ambush the Plaintiffs at trial so that they have to be burdened with the expense and time[-]wasting chore of preparing to cross examine a plethora of witnesses, many of whom will never be called."[50] Citing Rule 403, the Plaintiffs ask the Court to preemptively exclude experts even before trial.

The Defendants argue in opposition that they timely disclosed all of their experts in the case, and the Plaintiffs never requested an extension of the Scheduling Order to allow for more time to depose the defense experts. Moreover, upon the Defendants' designation of experts, the Plaintiffs did not seek to limit the number of expert witness, but rather sought to extend written discovery to avoid the expense of numerous expert depositions. The Defendants also point to the complexity of the case, the need for experts in several different areas of expertise, and the sporadic schedules of physicians acting as expert witnesses. Ultimately, the Defendants argue that a court-imposed limitation under Rule 403 is premature.

Rule 403 provides that the court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."[51] The Court agrees with the Defendants that, at this stage, limiting the number of experts because they might present cumulative evidence is premature. The Plaintiffs only cite the general subject

---

[49] Pls.' Mem. in Supp. Mot. to Limit Expert Witnesses 2, ECF No. 217.

[50] *Id.*

[51] Fed. R. Evid. 403.

matter on which each expert will testify and make no reference to any specific cumulative material contained in the experts' reports. Although the designation of multiple witnesses with overlapping opinions presents a burden on the Plaintiffs, the Court will not limit the number of expert witnesses before trial and without sufficient facts to determine whether each expert will testify as to the exact same issue. To do so would, in effect, exclude witnesses before the trial through Rule 403. Whether the experts' testimony will become cumulative is not ascertainable at this stage. Thus, the Plaintiffs' Motion to Limit the Number of Experts is **DENIED**.

Nevertheless, in light of the Defendants' designation of so many experts and to preempt cumulative testimony, the Defendants are **ORDERED** to file a "Notice of Order of Expert Witness Testimony at Trial," which shall set forth the order of expert witnesses that each Defendant intends to call to testify at trial. The Notice shall set forth the precise subject matter to which each defense expert will testify at trial. Furthermore, the Notice shall list in chronological order the name of each expert witness that each Defendant anticipates calling to testify as to that particular subject matter at trial. The Notice shall be filed with the Clerk of the Court by no later than the close of business on June 30, 2015. Under its broad power to exercise reasonable control over the mode and order of examining witnesses under Rule 611(a),[52] the Court will hold the Defendant to its order of expert witnesses. Furthermore, at trial and in accordance with Rule 403, the Court will not allow relevant testimony if the probative value of such testimony is substantially outweighed by the danger of needlessly presenting cumulative evidence.

---

[52] Fed. R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: . . . (2) avoid wasting time . . . .")

## CONCLUSION

The Defendants' Motions to Exclude the opinions of Drs. Gruszecki, Johnston, and Vane under Rule 702 are **DENIED**. The Court defers its final ruling on the Defendants' Motion for Sanction for spoliation of evidence, but if a test to determine dilution is possible, the Court will issue an appropriate jury instruction as a sanction. The Defendants' Motion to Exclude Dr. Schoepf is **GRANTED**, and finally, their Motion for Summary Judgment is **DENIED**. The Plaintiffs' Motion to Limit the Number of Expert Witnesses is likewise **DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
HON. S. THOMAS ANDERSON
UNITED STATES DISTRICT COURT

Date: May 18, 2015.